**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| MARK CLARK and WILLIAM PERSON, | ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 4:14-cv-00668-FJG |
| v. | ) ) | |
| YRC FREIGHT, | ) ) | |
| Defendant. | ) ) | |

# ORDER

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. No. 76). Also pending is plaintiffs' motion for appointment of counsel (Doc. No. 99).

## I.    Background

Plaintiffs filed the instant case on June 23, 2014 in the Circuit Court of Jackson County, Missouri. Plaintiffs named as defendants their former employer, YRC Freight, as well as their union, International Brotherhood of Teamsters Local 41 (hereafter, "Union"). Plaintiffs' initial petition made claims for (1) race discrimination and/or retaliation under the MHRA as to both plaintiffs; (2) age discrimination in violation of the MHRA as to plaintiff Clark; and (3) disability/perceived disability discrimination in violation of the MHRA as to plaintiff Clark. The case was removed to federal court on July 30, 2014. On March 11, 2015, the Court granted the Union's motion to dismiss, and denied plaintiff's motions for leave to amend the complaint. See Order, Doc. No. 49. On October 1, 2015 (after filing suggestions in opposition to the pending motion for summary judgment), plaintiffs' counsel moved to withdraw as attorneys of record due to a conflict of interest. The Court granted the motion to withdraw on December 30, 2015.

<u>See</u> Order, Doc. No. 94.  Thereafter, plaintiffs filed a motion for appointment of counsel (Doc. No. 99), which defendant opposes.

## II.    Facts

### A.    Plaintiffs' Employment with YRC

YRC Inc. d/b/a YRC Freight is a transportation and logistics services company headquartered in Overland Park, Kansas, which provides less-than-truckload freight carriage, freight forwarding, warehousing, truckload brokerage, contract carriage, and transportation management services. YRC has operations throughout the United States, including a terminal in Kansas City, Missouri.  Mark Clark and William Person are African Americans and former employees of YRC.  Clark worked for YRC as a linehaul driver at YRC's Kansas City, Missouri terminal from approximately August 2001 to April 2013.  Person worked for YRC as a linehaul driver at YRC's Kansas City, Missouri terminal from approximately August 2005 to April 2013.  In 2013, YRC's Linehaul Manager, Brian Kristensen, supervised linehaul drivers including Clark and Person. Clark and Person were both members of the International Brotherhood of Teamsters Local 41 ("the Union"), the exclusive bargaining representative of drivers and certain other employees based at the Kansas City terminal.

### B.    Agreements Between YRC and the Union

The terms and conditions of linehaul drivers' employment were governed by agreements between YRC and the Union, including a collective bargaining agreement and Local Work Rules. According to defendants' witnesses, Kristensen and Gary Krauss (Director of Labor for the Central Region for YRC Freight) the Local Work Rules supersede the collective bargaining agreement. Doc. No. 77, Ex. F, Kraus Depo. 11:19-

22; Doc. No. 77, Ex. D, Kristensen Depo. 14:11-12. Plaintiff Clark, however, denies this fact, indicating by declaration that "Local YRC rules do not supersede the collective bargaining agreement." Doc. No. 80, Ex. F, Clark Decl., ¶1.[1]

YRC linehaul drivers bid to be placed onto one of three separate boards – relay, sleeper, and extra board – that carry out different types of dispatches (*i.e.*, an assigned load of freight to be transported to a destination). For example, a "sleeper board" driver pairs with another sleeper board driver to transport freight longer, interstate distances requiring periods of rest. The collective bargaining agreement provides that the "A-B-C dispatch" principle applies to sleeper routes. An "A-B-C dispatch" is essentially a three-leg dispatch. For example, a sleeper team might carry out an A-B-C dispatch as follows: dispatch "A" from Kansas City to Tracy, California; dispatch "B" from Tracy to Reno, Nevada; and then dispatch "C" from Reno to Kansas City.

The Local Work Rules provide the following regarding sleeper drivers and A-B-C dispatches:

> Per contract language, you must be sent home on your third (3rd) dispatch unless otherwise agreed, meaning incorporated in a bid or otherwise agree[d] to by the team. YRC was unable to communicate between terminals in determining which dispatch leg you are on so they implemented the use of a Code "9" or "home only" as a means to inform terminals you should be sent home. If you are wanting to be sent back to your home domicile, it is recommended you inform each terminal, beginning with the first (1st) your Code "9" choice. A two (2) hour penalty will be paid for every terminal you hit past your "C" dispatch excluding one (1) VIA terminal on your return trip. More information is available in subsection "VIA."

---

[1] The Court notes that plaintiffs' only evidence that the local rules do not supersede the collective bargaining agreement is plaintiff Clark's self-serving testimony. The Court finds plaintiff Clark's interpretation of the interaction between the Collective Bargaining Agreement and the Local Work Rules to be dubious, considering that the Union upheld his termination.

Case 4:14-cv-00668-FJG   Document 101   Filed 03/08/16   Page 3 of 24

> If you volunteer to [waive your] A-B-C dispatch you will not be entitled to any two (2) hour penalty. If you are on an A-B-C dispatch and your "C" dispatch is not home or to a VIA point on your way home there is a two (2) hour penalty per driver to be paid for each terminal you reach until you are dispatched home. You may be dispatched on only one (1) VIA on the return leg without penalty.

Doc. No. 77, Ex. H, Local Work Rules p. 26 ("A-B-C Dispatch"), p. 34 ("VIA"). "Code 9" requests, therefore, are drivers' requests to return to their home terminal on their "C" dispatch, or the third leg of a three-leg dispatch. YRC's witnesses indicate that the Local Work Rules do not guarantee that "Code 9" requests will be approved. Doc. No. 77, Ex. F, Kraus Depo. 10:18-22, 11:7-9; Doc. No. 77, Ex. D, Kristensen Depo. 17:13-16, 23:2-3; Doc. No. 77, Ex. E, Kraus Decl. ¶ 7; Doc. No. 77, Ex. A, Kristensen Decl. ¶¶ 7-8. Plaintiffs, however, deny this statement, indicating that YRC was contractually obligated to honor a request for a "Code 9," citing the testimony of plaintiff Clark and unspecified sections of the Collective Bargaining Agreement (Doc. No. 77, Ex. G).

Defendant indicates that while it attempts to accommodate "Code 9" requests when feasible, it is permitted to send drivers on additional dispatches after a "Code 9" request is made. Doc. No. 77, Ex. E, Kraus Decl. ¶ 7; Doc. No. 77, Ex. A, Kristensen Decl. ¶ 8; Doc. No. 77, Ex. I, Goeckner Depo. 17:21-25. When YRC cannot grant a "Code 9" request, YRC requires a driver to nonetheless carry out his/her assigned dispatch, and YRC would have to pay the drivers additional compensation (a two-hour penalty) for every terminal after the third leg of a three-leg dispatch. Doc. No. 77, Ex. F, Kraus Depo. 9:4-8, 13:14-19; Doc. No. 77, Ex. A, Kristensen Dec. ¶ 8; Ex. D, Kristensen Depo. 21:16-22; Ex. E, Kraus Dec. ¶ 7; Ex. I, Goeckner Depo. 17:17-25; 15:7-10; Doc. No. 77, Ex. H, Local Work Rules pp. 26, 34. Pursuant to Article 46 of the collective bargaining agreement, YRC can discharge a linehaul driver, without prior warning

notice, for intentionally abandoning equipment. Doc. No. 77, Ex. G, Collective Bargaining Agreement pp. 184-185; Doc. No. 77, Ex. E, Kraus Decl. ¶ 12.

### C.    Plaintiffs' April 2013 Actions

On April 2, 2013, Clark and Person were sleeper board drivers working as a "sleeper team" who were assigned and carried out a dispatch from the Kansas City, Missouri terminal to YRC's Tracy, California terminal. While at the Tracy terminal, Person had called the Kansas City terminal and asked Dispatcher Mark Thompson to enter a "Code 9" in the system to request to return to Kansas City after completing their dispatch from Tracy to Reno. On April 3, 2013, Clark and Person were then assigned a dispatch from YRC's Tracy, California terminal to YRC's Reno, Nevada terminal. At the Reno terminal on April 4, 2013, Clark and Person were informed they had a dispatch assignment from Reno, Nevada to Portland, Oregon.

Plaintiffs admit that they did not take the assignment from Reno to Portland. According to Person, when the Reno dispatcher informed Person the team had an assignment to Portland, Person said he "had a Code 9 in" and returned to the tractor. According to Clark, he participated in a conference call with the Reno dispatcher (Joe Powell), the Kansas City dispatcher (Mark Thompson), YRC's central dispatch office (Tim Goeckner), an alternate road steward, and city side steward. Clark admits he said he was not refusing the dispatch, but he was not going to Portland. Clark then walked out to his tractor and left the Reno terminal, without any trailer attached to the tractor. [2]

---

[2] Plaintiffs attempt to deny this statement, arguing that they, "per their work rules, enforced their contractual rights in making the decision to not go to Portland." Defendant, in reply, correctly notes that this is not a dispute over the substance of this fact; instead, it is an attempt to explain why plaintiffs did what was described in that

Person was asleep in the tractor when Clark drove out of the Reno terminal. Clark and Person then bobtailed (i.e., drove the tractor without trailers attached) from the Reno terminal to the Kansas City terminal for over 1,600 miles. Plaintiff Clark indicated in his deposition that, despite leaving the trailers behind in the Reno terminal, Plaintiffs never "abandoned" their trailers. See Doc. No. 80, Ex. A, Clark Depo. 82:08- 82:11; 85:08-85-16.

Defendant indicates that refusing a dispatch and then bobtailing can be extremely costly to the company, delay customer freight, and cause gaps in service. Doc. No. 77, Ex.. E, Kraus Dec. ¶ 11. At no point during the drive back to Kansas City did Clark or Person call YRC.

### D. Plaintiffs' Suspensions and Terminations

After the team arrived at the Kansas City terminal on April 5, 2013, Linehaul Manager Brian Kristensen asked Clark and Person to provide statements of the events that took place in Reno; both drivers refused. Kristensen informed the drivers they were being suspended pending investigation. Kristensen and Gary Kraus, YRC's Director of Labor for the Central Region, investigated Clark and Person's actions and made the decision to terminate Clark and Person's employment on the basis of intentionally abandoning their assigned route and YRC job equipment. Doc. No. 77, Ex. K, Termination Letters; Doc. No. 77, Ex. D, Kristensen Depo. 36:12-15; Doc. No. 77, Ex. F, Kraus Depo. 5:17-18; Doc. No. 77, Ex. A, Kristensen Decl. ¶ 14; Doc. No. 77, Ex. E, Kraus Decl. ¶ 12. On April 11, 2013, Person and Clark were discharged.

statement of fact. The Court considers this fact deemed admitted. See Local Rule 56.1(a).

According to Mr. Kraus, the only two drivers he is aware of that were fired for "refusing a dispatch" following a request for a "Code 9", are Clark and Person. Doc. No. 80, Ex. E, Kraus Depo. 16:01-16:07.

### E.    Grievance Process

Clark and Person both filed grievances through the Union protesting the termination of their employment with YRC. Kraus presented the Company's case at each grievance hearing. Prior to the grievance hearings, Kraus had never met Person or Clark.  However, Mr. Kraus testified he may have known Plaintiffs were African-American, prior to meeting them, as it may have come up in a conversation. Doc. No. 80, Ex. E, Kraus deposition 15:18-15:25.

Person's grievance deadlocked at the local level (Missouri-Kansas Committee). The grievance then advanced to the regional level (Joint Area Committee), where a joint committee comprised of both union and management representatives held a full hearing, denied Person's grievance, and upheld YRC's decision to discharge Person under the collective bargaining agreement. After advancing to the regional level (Joint Area Committee) on a point of order and returning to the local level, Clark's grievance was heard by a full hearing before the Missouri-Kansas Committee comprised of both management and union representatives, which denied Clark's grievance, and upheld YRC's decision to discharge Clark under the collective bargaining agreement.

### F.    Plaintiffs' Charges of Discrimination

Person filed a Charge of Discrimination with the MCHR and EEOC on April 17, 2013 alleging only race discrimination relative to his discharge. Clark filed a Charge of Discrimination with the MCHR and EEOC in November 2012 alleging race and disability

discrimination relative to medical benefits. Clark filed a Charge of Discrimination with the MCHR and EEOC on April 15, 2013 alleging race and disability discrimination and retaliation relative to his discharge.

Clark was born on December 13, 1960, making him 52 years old at the time of his termination from YRC. Clark admits, however, his April 2013 Charge does not allege discrimination based on age; he never amended his April 2013 Charge to assert age discrimination; and never filed a new charge against YRC alleging age discrimination. Doc. No. 77, Ex. B, Clark Depo. 137:14-138:20; Doc. No. 77, Ex. P, Clark April 2013 Charge of Discrimination. Clark admits he could not point to any comments made about his age at YRC; could not say Kristensen had any age-based animus against him; and would say in 2013, 65% of drivers were over the age of 50. Kristensen was 43 years old and Kraus was 58 years old at the time of Clark's termination from YRC in April 2013. Kraus was not aware of Clark's age at the time of his termination in April 2013. Person admits nothing was said in the suspension meeting concerning his or Clark's races, ages, prior work-related injuries, or his prior grievances.

Clark and Person point to the following incidents involving other drivers at the Kansas City terminal to support their race discrimination claim:

- That a Caucasian driver named J.D. Russell, while in St. Paul, Minnesota, was instructed to take a truck to Chicago and instead refused, flying home and leaving his tractor and trailer behind. Russell was terminated for 31 days and then reinstated after grieving his termination.

- That after a team of Caucasian drivers named Wayne Raybourn and Mike Nichols ignored an assignment to drive trailers to the Omaha terminal and instead drove to their home terminal, they only received warning letters.

- That previously Clark was working with a Caucasian co-driver, Michael Jackson; they both committed the same conduct and were issued warning letters; and Jackson's letter was rescinded, but Clark's letter was not.

Doc. No. 77, Ex. B, Clark Depo. 65:22-66:4, 163:8-164:12, 225:13-226:5, 226:25-228:25, 229:11-230:17; Doc. No. 77, Ex. C, Person Depo. 162:3-168:13.

Clark and Person admit they do not know who made the discipline decisions relative to Russell, Raybourn, and Nichols and that they have no evidence that Kristensen was involved. Clark also admits the person who made the discipline decision for Jackson was Alvin Schrepel, not Kristensen. Kristensen and Kraus were not involved in the disciplinary decisions for Russell, Raybourn, Nichols, or Jackson. Kristensen and Kraus were not even aware of the incidents involving Russell, Raybourn, Nichols, or Jackson, or their related discipline at the time of Clark and Person's suspension and discharge. Kristensen and Kraus first heard about the alleged situations with Raybourn and Russell when the names were raised by the Union in relation to Clark and Person's post-termination grievances.

Clark admits his interactions at the grievance hearings was the first time he met Kraus and was the extent of his dealings with Kraus. He did not know Kraus enough to be able to say Kraus had some racial animus towards him. Person admits he did not believe Kristensen had any racial animus against him; if anything he admitted any animus was due to their sports affiliations. When asked to explain why he believed race played a role in his termination, Person explained that he thought "whoever [Kristensen] talked to on the phone" in the suspension meeting "had something against [Clark], not [Person], because nobody knew who [Person] was," but Person was on a team with Clark so YRC wanted to get rid of both of them. Doc. No. 77, Ex. C, Person Depo. 184:16-186:17.

Clark admits he had filed multiple charges of discrimination against YRC in the past. He also admits he filed an employment discrimination lawsuit against YRC as far back as 2007, but was not discharged until April 2013. At the time of Clark's termination, Kraus was not aware of any prior charges of discrimination, lawsuits, or race discrimination complaints that Clark or Person had made against the Company. At the time of Clark's termination, Kristensen was not aware that Clark had filed any prior charges of discrimination or lawsuit against the Company, and was not aware of any race discrimination complaints by Clark.

Clark claims his alleged disabilities were the result of on-the-job injuries related to his ankle, hip, and back, for which he was out for surgery in May 2010 and September 2012 – February 2013. When he returned from leave in February 2013, he continued working as a driver without accommodation. At the time of Clark's termination, Kraus was not aware of any prior work-related injuries, medical conditions, or leaves of absence taken by Clark. Ex. E, Kraus Dec. ¶ 17; Ex. F, Kraus Depo. 17:11-13. Plaintiff Clark indicates that Kristensen, however, was aware of his medical condition and requested that he return to work within 72 hours in February 2013. Doc. No. 80, Ex. A, Clark Depo. 127:21- 130:14; Doc. No. 80, Ex. D, Kristensen Depo. 41:07-41:15, 42:09-42:11. Clark admits it is common for drivers to suffer work-related injuries; indeed, he had seven on-the-job accidents in his 12 years of employment.

Clark indicated at deposition that no one in YRC management ever made negative comments to his face about his on-the-job injuries; however, he indicates that unspecified co-workers told him about negative comments. Doc. No. 77, Ex. B, Clark Depo. 223:12-224:1 (wherein Clark also notes that comments heard about from

someone else "would still be hearsay, wouldn't it?" id. at 223:18-19). Clark did not point to specific management employees who allegedly made comments to others about his on-the-job injuries. Id. When asked whether he believed YRC wanted to fire him because he was hurt on the job, Clark could only state he "believed it played a role" because apart from multiple injuries, he was not a bad apple, otherwise had a good work rapport, and got along with management. He just did not believe "in his heart of hearts" that the incident of him bobtailing from Reno home caused his termination. Id. at 222:9-20.

Clark admits he never had an issue with Kristensen, never had any dealings with [Kristensen], and "had a pretty good rapport with [Kristensen]" up until the day of his termination. Ex. B, Clark Depo. 20:4-14; 170:18-20. Clark, however, testified that he witnessed Mr. Kristensen treat Caucasian drivers differently than he was treated, but he was unable to specify how that was done or what Mr. Kristensen did. Doc. No. 77, Ex. B, Clark Depo. 166:04-169:23. Clark's issue with Kristensen relative to his termination was his belief that Kristensen was a puppet following someone else's orders without having a conversation with Clark, as Clark had seen Kristensen do in meetings with other drivers. Doc. No. 77, Ex. B, Clark Depo. 166:4-168:9. Clark believes YRC plus the Union plus the union grievance Committee were all discriminating against him based on race.

Person indicates that prior to being terminated he complained to the company that he was being discriminated against. Doc. No. 80, Ex. C, Person Depo. 182:13-177:03 (indicating that various complaints regarding favoritism and racism in hiring practices, were made to "Brian"). During his tenure with YRC, Clark asserts he

Case 4:14-cv-00668-FJG   Document 101   Filed 03/08/16   Page 11 of 24

complained about racist cartoons posted in the workplace as well as being called a "smart ass [nigger]" by Jeff Carver. Doc. No. 80, Ex. A, Clark Depo. 158:14-160:08.[3] Similarly, Person asserts that during his employment at YRC, he experienced insensitive racial comments and pictures. Doc. No. 80, Ex. C, Person Depo., 150:07-18.[4]

## III. Standard

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–90 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586–90.

A nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

> The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

---

[3] As noted by defendants, there is no indication in the record that Kraus or Kristensen, the decisionmakers, were aware of these incidents or that these incidents influenced the discharge decision.

[4] Again, there is no indication that Kraus or Kristensen were aware of these incidents (which were not specifically identified or detailed in the cited deposition testimony).

<u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citations and quotations omitted).

## IV.   Discussion

### A.   Count I – Plaintiffs' Race Discrimination Claims

In Count I of the Complaint, plaintiffs allege defendant "illegally terminated [them] because of their race."  Doc. No. 1-1, ¶ 46.  The elements of a race discrimination case under the MHRA are:  (1) defendant subjected plaintiffs to an adverse employment action; (2) plaintiffs' race was a contributing factor in such action; and (3) as a direct result, plaintiffs suffered damages.  <u>Daugherty v. City of Maryland Heights</u>, 231 S.W.3d 814, 820 (Mo banc. 2007); R.S.Mo. §213.055.1(1).   Defendant asserts that plaintiffs cannot meet the second element of this case.

First, defendants assert that there is no direct evidence of race discrimination. With respect to direct evidence under the MHRA,

> "Direct evidence is that which shows a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding that an illegitimate criterion actually motivated the employment decision." <u>Daugherty</u>, 231 S.W.3d at 818 n. 4; <u>accord</u> <u>Con–Way Freight, Inc</u> ., 622 F.3d at 936; <u>Torgerson</u>, 605 F.3d at 594. Such evidence "includes conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude...." <u>Daugherty</u>, 231 S.W .3d at 818 n. 4. <u>See e.g.</u> <u>Davison v. City of Minneapolis, Minn.</u>, 490 F.3d 648, 654 (8th Cir.2007) (citing as an example of direct evidence of race discrimination a statement by a decisionmaker that he would not hire any black people if it were his company); <u>King v. Hardesty</u>, 517 F.3d 1049, 1058–59 (8th Cir.2008) (statement by decisionmaker to African–American teacher "that 'white people teach black kids ... better than someone from their own race' " could be viewed as direct evidence in support of teacher's claim that her race was a motivating factor in the school district's decision to exclude her from substitute teaching). Such evidence does *not* include " 'stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process.'" <u>Elam v. Regions</u>

Fin. Corp., 601 F.3d 873, 878 (8th Cir.2010) (quoting <u>Clearwater v. Indep.</u>
<u>Sch. Dist. No. 166</u>, 231 F.3d 1122, 1126 (8th Cir.2000)).

<u>Burrow v. Boeing Co.</u>, No. 4:09CV2073 TCM, 2011 WL 1594937, at *7 (E.D. Mo. Apr.
27, 2011) <u>aff'd,</u> 458 F. App'x 577 (8th Cir. 2012).

Here, with respect to Kraus, it appears that plaintiffs did not even meet Kraus
until their post-termination grievance proceedings. Plaintiffs do not provide any direct
evidence of racial animus by Kraus at all. With respect to Kristenson, Person testified
that if Kristensen had animus toward him, it was due to their affiliation for different
sports teams. Clark, in his deposition, also did not point to race-based comments or
other similar evidence as to Kristensen. Instead, Clark took issue with Kristensen not
being as conversational in his disciplinary meeting with Clark following April 2015
incident as Kristensen had been in other disciplinary meetings with other drivers.

In plaintiffs' response to the summary judgment motion, they point to incidents
during their tenure at YRC, including (1) Clark complaining to human resources
regarding double standards as well as being called a "smart ass [nigger]" by a fellow
employee; (2) Person experiencing insensitive racial comments and pictures during his
time at YRC; and (3) Clark witnessing Kristensen's differing treatment of Caucasian
drivers as it relates to their discipline. However, as noted by defendant in its reply brief,
the first two categories of incidents fall in the category of "stray remarks in the
workplace [or] statements by nondecisionmakers." <u>See</u> <u>Burrow</u>, 2011 WL 1594937, at
*7. The statement that Clark witnessed Kristensen's differing treatment of Caucasian
drivers, moreover, is not sufficient to avoid summary judgment as it is no more than a
self-serving conclusion which is unsupported by specific facts or evidence. <u>See</u>
<u>Thomas v. Corwin</u>, 483 F.3d 516, 527, 530 (8th Cir. 2007) (finding that a plaintiff's

"skeletal allegations" that she was treated differently than similarly situated males was insufficient to create a genuine issue of fact for summary judgment where she did not support that statement with specific facts of evidence). Therefore, the Court finds that plaintiffs cannot provide direct evidence of race discrimination.

The other way plaintiffs attempt to demonstrate a race discrimination claim is by showing that they were treated differently than Caucasian drivers. Specifically, plaintiffs claim that Caucasian drivers Russell, Raybourn, and Nichols ignored dispatch instructions or abandoned job equipment, and were not discharged. Defendants note, however, that plaintiffs cannot show that those drivers are similarly situated to plaintiffs in all ways because the discipline decisions were made by different supervisors than the ones who discharged Clark and Person. See Burrow v. Boeing Co., No. 4:09CV2073 TCM, 2011 WL 1594937, *9 (E.D. Mo. Apr. 27, 2011) aff'd, 458 F. App'x 577 (8th Cir. 2012) (finding that, to be similarly situated, the individuals used for comparison must have dealt with the same supervisor, been subject to the same standards, and engaged in the same conduct) (citing Hervey v. Cnty. of Koochiching, 527 F.3d 711, 720 (8th Cir. 2008)). Here, defendant notes that neither Kraus nor Kristensen were involved in the prior discipline decisions involving Caucasian employees, and the undisputed facts show that neither Kraus nor Kristensen were aware of the discipline decision as to Russell, Raybourn, and Nichols until after plaintiffs were terminated.[5]

---

[5] Additionally, defendant notes that employee Russell was terminated by defendant and returned to work only after he had gone through the grievance process through the Union, showing that defendant treated a Caucasian employee the same as plaintiffs (the only difference being the outcome of the Union grievance).

In response, plaintiffs argue that the contributing factor standard under Missouri law is intended to be broad, and is a factor which contributes a share in anything or has a part in producing the effect. McBryde v. Ritenour School Dist., 207 S.W.3d 162, 171 (Mo. Ct. App. E.D. 2006). Plaintiffs argue that YRC's treatment of Caucasian employees Russell and Raybourn was different than its treatment of plaintiffs. Plaintiffs further argue that their act of leaving their trailer in Reno, Nevada was merely plaintiffs' attempt to enforce their contractual rights under the Collective Bargaining Agreement.[6] However, the issues raised by plaintiffs do not rebut the material fact that the decisionmakers, Kraus and Kristensen, had any involvement in the discipline decisions made as to the Caucasian drivers, and thus plaintiffs have not demonstrated that the Caucasian employees are similarly situated. Furthermore, the issue in this case is not whether plaintiffs' Code 9 request should have been denied; rather, the issue is about whether race discrimination was a contributing factor to their termination.

Although the contributing factor standard is broad, it is not toothless. Plaintiffs have not demonstrated that their race was a contributing factor in defendant's discharge decision. Therefore, summary judgment is **GRANTED** as to plaintiffs' race discrimination claims.

### B.    Count I – Clark's Retaliation Claim[7]

_____

[6] The Court finds this to be a specious argument. If plaintiffs wanted to enforce their contract rights, they should have filed a grievance with the Union instead of abandoning their assigned trailer in Nevada.

[7] Although paragraph 46 of the Complaint alleges that defendant illegally terminated "Plaintiffs" in retaliation against them, plaintiff Person did not allege retaliation in his underlying charge of discrimination and has come forth with no evidence that he was terminated in retaliation for something. Plaintiff Person, moreover, did not come forth with any evidence of argument in support of this claim in his suggestions in opposition to the motion for summary judgment. Therefore, to the extent that Person has alleged a claim for retaliation, that claim must be dismissed.

Case 4:14-cv-00668-FJG   Document 101   Filed 03/08/16   Page 16 of 24

In Count I, plaintiffs allege: "Clark was retaliated against for filing previous charges of discrimination against the company." Complaint, Doc. No. 1-1, ¶ 42. The MHRA makes it unlawful to "retaliate or discriminate in any manner against any other person because such person ... has filed a complaint ... pursuant to this chapter." R.S.Mo. § 213.070. The elements of a *prima facie* case of retaliation under the MHRA are: (1) plaintiff engaged in protected activity; (2) the employer took adverse action against him; and (3) a causal connection existed between the complaint and the adverse action. McCrainey v. Kan. City Mo. Sch. Dist., 337 S.W.3d 746, 753 (Mo. App. W.D. 2011).

Defendant asserts that plaintiff Clark cannot establish a causal connection between any prior Charge of Discrimination or lawsuit he filed against the company and his termination. To establish a causal connection, he must demonstrate that the prior charges of discrimination were a "contributing factor" in his termination. Williams v. Trans States Airlines, Inc., 281 S.W.3d 854, 866 (Mo. Ct. App. E.D. 2009). Defendant notes that the undisputed evidence is that the decisionmakers, Kristensen and Kraus, were unaware of Clark's prior charges of discrimination against the company. Under similar facts, where the decisionmakers did not know of the protected activity at the time of the discharge decision, other courts in this district have dismissed retaliation claims. See Wallendorf v. Union Elec. Co., No. 2:10-CV-04065-NKL, 2011 WL 529552, *5 (W.D. Mo. Feb. 7, 2011) (dismissing Title VII retaliation claims, finding that decisionmaker was unaware of protected activity at the time adverse action was taken); Dudley v. Lake Ozark Fire Prot. Dist., No. 09-4086-CV-C-NKL, 2010 WL 1992188, *7 (W.D. Mo. May 17, 2010) (granting summary judgment on MHRA retaliation claim

where decisionmakers were unaware of plaintiff's discrimination complaints when they terminated his employment).

In response, plaintiff Clark asserts that the MHRA imposes liability on an employer "when an improper consideration is a contributing factor, regardless if other factors exist." McBryde v. Ritenour School Dist., 207 S.W.3d 162, 170 (Mo. Ct. App. E.D. 2006). Clark, therefore, argues that he does not have to show that he was terminated because of his previous discrimination charges, but only that those charges contributed to the decision to terminate him. Plaintiff Clark then indicates that the fact that he filed previous charges of discrimination and a lawsuit for same create a genuine issue of material fact as to whether his prior protected activity was a contributing factor in the termination decision.

The Court finds that the mere fact that plaintiff engaged in protected activity is not enough, by itself, to show that the prior protected activity was a contributing factor in the termination decision. The Court agrees with the reasoning in Dudley and Wallendorf that, where the decisionmakers are unaware of prior protected activity, plaintiff cannot demonstrate that the prior charge of discrimination was a "contributing factor" in his termination. Accordingly, the Court finds that summary judgment must be granted as to plaintiff Clark's retaliation claim contained in Count I.

C. **Count II - Clark's Age Discrimination Claim**

Defendant indicates that Clark's age discrimination claim should be dismissed due to Clark's failure to exhaust administrative remedies on this claim, as Clark did not mention age discrimination in his Charge of Discrimination.

[R.S.Mo.] Section 213.075.1 states that a charge filed with the MCHR, within 180 days of the alleged act of discrimination, shall "set forth the

particulars" of the unlawful discriminatory practice. The MHRA requires that all administrative remedies be exhausted before petitioning the courts for relief. Alhalabi v. Missouri Department of Natural Resources, 300 S.W.3d 518, 524 (Mo.App. E.D.2009). In order to exhaust all administrative remedies, the claimant must give notice of all claims in the administrative complaint. Id. at 525. However, "administrative complaints are interpreted liberally in an effort to further the remedial purposes of legislation that prohibits unlawful employment practices." Id. Accordingly, administrative remedies will be exhausted as to all incidents that are like or reasonably related to the allegations contained in the charges filed with the MCHR. Id. Furthermore, "the scope of the civil suit may be as broad as the scope of the administrative investigation which could reasonably be expected to grow out of the charge of discrimination." Id.

Reed v. McDonald's Corp., 363 S.W.3d 134, 143-44 (Mo. Ct. App. 2012).

Here, defendant notes that the Charge does not contain any reference to age discrimination at all. The only mention of Clark's age is a data box containing plaintiff Clark's date of birth, a box completed by every claimant filling out the form. Clark did not check the "age" box or otherwise refer to his age in the body of the charge; instead, he alleges only that he was terminated due to his race, disability, and in retaliation for filing prior charges of discrimination.

In response, plaintiff Clark notes that the Missouri Supreme Court takes a liberal approach to fulfillment of procedural requirements under the MHRA (Hill v. Ford Motor Company, 277 S.W.3d 659, 670 (Mo. 2009)), and that under Alhalabi, strict compliance with the technical requirements of the MHRA was excused where the scope of the administrative investigation could reasonably be expected to grow from the charge of discrimination to encompass further types of actionable conduct. Alhalabi, 300 S.W.3d at 525. However, as noted by defendant in its reply, in Alhalabi, the court found it proper to allow the plaintiff to pursue a hostile work environment claim that was not separately alleged in the Charge (which instead alleged race discrimination) where the

plaintiff alleged <u>facts</u> in the Charge supporting a hostile work environment claim. In other words, given the facts alleged in the Charge, the scope of the investigation could reasonably be expected to include a hostile work environment investigation. <u>Id.</u> at 526. Here, plaintiff Clark's age discrimination claim is not reasonably related to his allegations of disability discrimination, race discrimination, or retaliation. <u>See</u> <u>Robertson v. Budrovich Excavating, Inc.</u>, No. 4:05CV00616 ERW, 2006 WL 2460794, *5 (E.D. Mo. Aug. 23, 2006) (finding allegations outside scope of those in charge to be precluded in subsequent lawsuit based on that charge). The Court finds that Clark has not exhausted his age discrimination claim, and therefore summary judgment must be granted on Count II.

**D.      Count III - Clark's Disability Discrimination Claim**

Defendant asserts that the disability discrimination claim in Count III fails because (1) there is no evidence that plaintiff Clark is "disabled" under the MHRA; (2) there is no evidence that Clark was perceived as disabled; and (3) there is no evidence that plaintiff Clark's disability or perceived disability was a factor in his termination.

**1.      Disability under the MHRA**

Defendant asserts that plaintiff Clark does not meet the definition of "disabiity" under the MHRA. To state a claim under the MHRA, the plaintiff must show that she is "(1) disabled within the meaning of the MHRA, (2) qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) suffered an adverse employment action because of [her] disability." <u>Olsen v. Capital Region Medical Center</u>, 713 F.3d 1149, 1154 (8th Cir. 2013). Under the MHRA, a "disability" is defined as "a physical or mental impairment that substantially limits one or more of a person's

major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job." R.S.Mo. § 213.010(4). Courts interpreting the definition divide it into two parts: (1) the person must have an impairment that limits major life activity; and (2) with or without reasonable accommodation, that impairment must not interfere with performing the job. Lomax v. DaimlerChrysler Corp., 243 S.W.3d 474, 480 (Mo. App. E.D. 2007). Under Missouri's state regulations, "major life activities" are defined as "those life activities which affect employability such as communication, ambulation, self-care, socialization, education, vocational training, employment and transportation. 8 C.S.R. § 60-3.060(1)(C). Minor temporary problems (such as broken bones, sprains, or colds) are not considered impairments resulting in disability. 8 C.S.R. § 60-3.060(1)(B)(1).

Here, defendant argues that the only impairment identified in the Complaint is Clark's work-related injury to his back, requiring surgery in May 2010 and September 2012. Defendant states that this is no ongoing impairment, noting that at deposition Clark did not indicate that this impairment affected any of his "major life activities," and did not prevent him from returning to work as a driver. Therefore, defendant asserts that plaintiff Clark has not demonstrated he has a disability as defined by the MHRA.

In response plaintiff indicates that he has a disability, and that Brian Kristensen called Mr. Clark and told him to return to work while Clark was out on what plaintiff calls "disability leave." See Doc. No. 80.[8] Plaintiff notes that at that time, in February 2013,

_____

[8] It appears from the record that Mr. Clark was out due to worker's compensation leave, which does not necessarily mean that Mr. Clark was "disabled" within the meaning of Missouri law.

he had been off work for over five months recovering from back surgery. But, as noted by defendant in reply, plaintiff calling his work-related injury a "disability" does not make it a disability within the meaning of the MHRA. Defendant indicates that the temporary leave of absence while recovering from back surgery does not make plaintiff disabled under the MHRA. See 8 C.S.R. § 60-3.060(1)(B)(1) ("Minor temporary illnesses shall not be considered physical … impairments resulting in a disability."); Cook v. Atoma Int'l of Am., Inc., 930 S.W.2d 43, 47 (Mo. Ct. App. E.D. 1996) (affirming summary judgment on MHRA disability discrimination claim where employee suffered temporary injury).

The Court agrees that, under the undisputed material facts of this case, the injury suffered by plaintiff Clark was temporary and does not constitute a disability under the MHRA. Therefore, to the extent that plaintiff claims discrimination based on actual disability, summary judgment must be granted in defendant's favor.

### 2. Perceived Disability under the MHRA

In the alternative, plaintiff Clark claims he was discriminated against based on "perceived" disability. A "perceived" or "regarded as" disability claim can be proven in one of two ways: (1) by showing that his employer mistakenly believed that he had a physical impairment substantially limiting one or more major life activities, or (2) by showing that his employer mistakenly believed that an actual nonlimiting impairment substantially limited one or more major life activities. Lehman v. United Parcel Service, Inc., No. 06-4020-CV-C-NKL, 2007 WL 603085, *5 (W.D. Mo. Feb. 22, 2007). It is insufficient to demonstrate that an employer regarded an employee as having a limitation that does not constitute a disability. Breitkreutz v. Cambrex Charles City, Inc., 450 F.3d 780, 784 (8th Cir. 2006) (noting that lifting restrictions alone do not constitute a

disability). Instead, plaintiff must show that the "employer mistakenly believe[d] that an employee is unable to perform a class of jobs or a broad range of jobs," to show that the employer regards the employee as disabled. Christensen v. Titan Distribution, Inc., 481 F.3d 1085, 1093 (8th Cir. 2007).

Defendant indicates that the facts do not show that it believed that plaintiff was unable to perform his job as a driver; instead, the facts demonstrate that YRC believed that Clark could perform his job duties as a driver despite his temporary leave. Although in response plaintiff indicates that he has a record of "disability," plaintiff does not provide any evidence that defendant mistakenly believed he had a physical impairment substantially limiting one or more major life activities. Plaintiff has done nothing to meet the standards set out in the MHRA and case law interpreting it. Therefore, defendant's motion for summary judgment must be granted as to any perceived disability claims, as well.

### 3. Disability as a Factor in Termination

Finally, in the alternative, defendant argues that even if Clark could show disability or perceived disability under the MHRA, he cannot show that those were a contributing factor to his termination. The existence of a disability and the occurrence of an adverse action, without more, are not sufficient for a successful disability discrimination claim. Chalfant v. Titan Distrib., Inc., 475 F.3d 982, 990-991 (8th Cir. 2007). Defendant notes that Clark has no evidence that his alleged or perceived disability contributed to the decision to terminate his employment. The only evidence presented in response to summary judgment is inadmissible hearsay that Clark heard from unidentified coworkers that negative comments were made by unidentified

management regarding his on-the-job injuries. As discussed by defendant, this is not enough for Clark's claims to survive summary judgment. Therefore, for all the foregoing reasons, summary judgment must be granted in defendant's favor on plaintiff Clark's disability discrimination claims.

## V.     Conclusion

Accordingly, for all the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. No. 76) is **GRANTED.** Plaintiffs' motion for appointment of counsel (Doc. No. 99) is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that the Clerk of the Court send a copy of this order by regular and certified mail to plaintiffs at the following addresses:

Mark Clark
3520 Roeland Avenue
Kansas City, Kansas 66104

William Person
4936 Wabash Avenue
Kansas City, Missouri 64130


**IT IS SO ORDERED**.


Date: __March 8, 2016__                          **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                              Fernando J. Gaitan, Jr.
                                                   United States District Judge